UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-80173-CR-CANNON

UNITED STATES OF AMERICA

vs.

WILLIAM MICHAEL SPEARMAN,

        Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT SPEARMAN'S MOTION FOR A DOWNWARD VARIANCE

**COMES NOW**, the United States of America, by and through its undersigned attorneys, and respectfully submits this sentencing memorandum and response to defendant William Michael Spearman's motion for a downward variance. [ECF No. 197].

The defendant is before this Court because he chose to run a massive, sprawling empire dedicated to images and videos of children being raped and abused. He did not do this because he is "broken." He did not do this because of PTSD. Nor did he do it because of depression, opioids, or any of the other myriad excuses he puts forth in his papers. He did it because he wanted to.

In fact, the defendant's papers present a bizarre, alternate world in which the defendant decided to run—not join, not visit, but *run*—an enormous child sexual abuse material ("CSAM") website despite harboring little to no sexual interest in children or in child pornography. This, simply put, is not even remotely believable.

Through his egregious criminal conduct, this defendant exploited a literally uncountable number of children. He presided as the leader of a community of pedophiles, allowed them to commit non-stop criminal activity, fostered an environment where users could revel in discussions of child sexual abuse, and provided advice on how not to be caught by law enforcement.

It is impossible to imagine a more aggravated case involving a defendant who has not been charged with producing CSAM than this one. The government therefore respectfully recommends that the Court sentence the defendant to a Guidelines sentence of life in prison.

## BACKGROUND

A federal grand jury charged the defendant with engaging in a child exploitation enterprise, as well as conspiracy to advertise and conspiracy to distribute child pornography, in violation of 18 U.S.C. §§ 2252A(g); 2251(d) and (e); and 2252A(a)(2) and (b)(1). [ECF No. 38]. On the first day of trial, he pleaded guilty with a plea agreement to one count of engaging in a child exploitation enterprise. Under the terms of his plea agreement, he will be permitted to appeal the Court's denial of his motion to suppress all the evidence from his home. [ECF No. 202 ("PSR") ¶¶ 97-107]. His guilty plea saved the government no time or resources because the prosecution team had already fully prepared for trial.

Given the severity of the defendant's conduct and his role in leading this community of child sex offenders, the United States opposes the defendant's request for a downward variance and submits that a Guidelines sentence of life in prison is lawful, just, and appropriate.

## SENTENCING ANALYSIS

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.'" 18 U.S.C. § 3553(a)(4)(A). The Sentencing Guidelines are thus the appropriate starting point from which the Court exercises its discretion under § 3553(a). *See United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18

U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

I.    **THE APPLICABLE SENTENCING GUIDELINES**

   A.    **The Accurately Calculated Guidelines Range Calls for a Life Sentence**

The U.S. Probation Office filed a final presentence investigation report containing the following Guidelines calculation:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.6(a)); | 35 |
| Enhancement for victims that had not attained 12 years, including infants and toddlers (*id.* § 2G2.6(b)(1)(A)); | +4 |
| Enhancement for conduct described in 18 U.S.C. § 2241(a) or (b) (*id.* § 2G2.6(b)(3)); | +2 |
| Enhancement for use of a computer (*id.* § 2G2.6(b)(4)); | +2 |
| Enhancement for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive (*id.* § 3B1.1(a)). | +4 |
| **TOTAL:** | **47** |

[PSR ¶¶ 97-107]. The Guidelines state that an offender's offense level will exceed 43 only "in rare cases," and in these rare cases the offense level should be reduced to level 43. U.S.S.G. Chapter 5, Part A, App. Note 2. This results in a total offense level of **43**. This calculation is accurate and reflects the facts underlying the defendant's offenses and other relevant conduct. The PSR further categorized the defendant in Criminal History Category I, which results in a Guidelines recommendation of life imprisonment. [*Id.* ¶¶ 110, 157].

The PSR also correctly notes that the defendant is subject to a mandatory minimum term of imprisonment of 20 years, a mandatory minimum term of supervised release of five years, a maximum fine of $250,000, a special assessment of $100 under 18 U.S.C. § 3013, a potential $5,000 special assessment under 18 U.S.C. § 3014, and an additional special assessment of up to $35,000 under 18 U.S.C. § 2259A. [PSR ¶¶ 156-67]. Finally, the defendant is required under 18 U.S.C. §§ 2259 and 2259A to pay restitution in the full amount of the losses incurred by any

3

victims as a result of his child-pornography-related conduct.  [*Id.* ¶ 168].

The defendant contests some of these enhancements, and the United States has explained why the enhancements are appropriate.  [ECF Nos. 176, 185.]  He also filed a sentencing memorandum requesting an unspecified downward variance.  [ECF No. 197].

**B.** **Even this Guidelines Range Fails to Account for the Full Range of the Defendant's Criminal Conduct**

The defendant was the highest-ranking leader of a child exploitation community that had ***thousands*** of members and existed for approximately half a decade.  [PSR ¶¶ 12, 24.]  By virtue of being calculated under U.S.S.G. § 2G2.6, his Guidelines range accounts for his involvement in a child exploitation enterprise.  But such an enterprise requires only four individuals.  *See* 18 U.S.C. § 2252A(g) (defendant must commit certain offenses "in concert with three or more other persons").  And a defendant does not need to be a leader of an enterprise to be convicted under 18 U.S.C. § 2252A(g).  *See, e.g., United States v. Grovo*, 826 F.3d 1207, 1215 (9th Cir. 2016) (rejecting the argument that "only the creators or staff of [a child pornography website] can be liable for the entire child exploitation enterprise" as "unpersuasive" and reliant on a "distinction [that] appears nowhere in the statute").  In addition, the defendant's role as a leader and organizer is accounted for under U.S.S.G. § 3B1.1(a).  But this enhancement also requires only five people.

The defendant's Guidelines range therefore entirely fails to account for the fact that he oversaw a massive, multi-thousand-user enterprise that lasted for approximately five years.  And it likewise does not fully account for the true danger and insidiousness that arise from child pornography communities.  In its 2012 Report to Congress, the Sentencing Commission made clear that online communities dedicated to child pornography and child sexual exploitation "allow child pornography offenders to connect with one another, commiserate about their marginalized status in society, and validate and normalize their sexual interest in children."  United States

Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at 92 (December 2012) ("2012 Report").[1]  While not every member of a child exploitation community has engaged in hands-on sex offenses against children, it found that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online."  2012 Report at 94 (emphasis in original).  The Commission found that such communities are also dangerous because they normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing CSAM to committing other sex offenses.  *Id.* at 97.

The defendant, of course, was not just a participant in or a visitor to such a community.  He was a principal reason why Website A existed and an immeasurable number of crimes against children took place over it.  His Guidelines range does not account for this at all.

## II.     THE 18 U.S.C. § 3553(A) FACTORS WARRANT A LIFE SENTENCE

In this case, there are no factors that warrant a variance or departure from the Guidelines range.  Despite his exceedingly serious criminal conduct, the defendant seeks a below-guidelines sentence that underserves the purposes of 18 U.S.C. § 3553(a).  In particular, § 3553(a)(1) provides that courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant in crafting a sentence.  Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed education or

---

[1] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last visited September 5, 2023).

vocational training, medical care, or other corrective treatment in the most effective manner. Section 3553(a) also instructs courts to consider the need to avoid sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). Careful consideration of these factors confirms that a life sentence is appropriate here.

A.     <u>**The Nature and Circumstances of the Offenses**</u>

The defendant was the #1 leader among the thousands and thousands of users of Website A. He does not appear to dispute that he was the "lead administrator" of the website and that other users called him "boss." [PSR ¶¶ 49-50.] Other members of Website A leadership clearly understood that he was in charge. [*See, e.g., id.* ¶ 46(f).] ███████████████████████

██████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████  █████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Within this room, the defendant was unambiguously in charge and spent much of his time barking orders at the other highest-ranking administrators. For example, he directed the following comments to the other users in this room (all spelling in original):

- "this is <u>NOT</u> how a fucking admin operates!! im sorry to say, but if you can't handle a little friction from a 13yo girl then u needa rethink ur role here – i assume that's what ur

---

[2] *See United States v. Rosenstein*, 9:22-cr-80107-AMC (S.D. Fla.).
[3] *See United States v. Martin, et al.*, 9:23-cr-8162-AHS (S.D. Fla.).

doing [] but it's rubbish that uv left us [] for your responsibilities – again, that's <u>NOT</u> how an admin is to function…"

- After another administrator told the defendant that he would be gone over the weekend, the defendant replied "wtf?" and "didn't u say on [date] that will be your last vacation days?"

- When another administrator noticed that a moderator had not logged into the website for 90 days, the defendant stated, "That's on you" and "I assumed you knew of something she told you regarding an expected absence.  If that's not the case, she's 60 days past due being demoted to member."

- "you've likely seen my rant in [another room] by now.  I'm seriously fucking pissed at [staff member].  He blew me off most of the weekend, after having given a good hour each of three days during the week.  At least he did get a little bit accomplished, but we seriously need to find somebody to replace his talents.  And soon."

- "Somebody tell me what's going on.  Is there a passive-aggressive munity [sic] going on or what?"

- He told a co-administrator that "I need to have you get your head back in the game, my friend.  I can't have you resign right now anyway.  It'd be a very sad situation for me in here chatting to myself about how I couldn't even keep a handle on running this site without [Rosenstein] around for more than three months."  He further told this other individual that "…I'm at a point how where I've got to have a partner in this shit!  One I can count on, one I can trust and who is there to bounce ideas off of on a regular/routine basis.  I'll be honest with you that I was really pissed off that you took that little vacation last month.  I felt it was irresponsible personally, financially, and to [Website A].  I can't really remember the last time I've had any vacation at all, plus I've even stopped going out on Friday nights because of my responsibility here.  I'm not trying to guilt-trip you either.  Like I said, I need to know I've got a partner here."

In this room, the defendant also supervised the day-to-day functioning of Website A, including assigning work to other administrators, promoting and demoting users, managing financial and logistical issues relating to the Website A servers, and counseling other users on the roles and expectations of the website.  [PSR ¶¶ 49-51].

Once the FBI identified and arrested Selwyn Rosenstein, the defendant quickly realized it and told his fellow administrators within this room.  He stated "I'm going to hope for the best but assume the worst.  The worst would be that the login by [Rosenstein] … was not [Rosenstein]."  He ordered the other administrators to "not send any mail to [Rosenstein] that would tip off LEA

or an intruder that we're aware of any breach."  ("LEA" refers to "law enforcement agency.")

Later, he told the room members "ok we've got a bad situation.  [Rosenstein] is obviously not

[Rosenstein].  I'm assuming he's LEA at this point and fully compromised."  He later stated that

he saw no reason to inform the Website A staff about the situation because doing so would

"potentially lose good members as well as tip off LEA that we know what they're doing."  He

added that "I don't mind LEA coming in and visiting staff lounge or whatever."

From this room and throughout Website A, the defendant directly or indirectly managed or

directed thousands of people on the website.  For example, the defendant presided over staff

meetings that included the entire next layer of management, including Gregory Good and Joseph

Stewart.  And he and the rest of the staff in turn exercised authority over the lower management

of the website, which included room moderators like Robert Boyles and Matthew Garrell.  Below

these tiers of management stood the thousands of ordinary members, users, and visitors of Website

A, which the defendant and his staff managed, directed, and advised.  *See* Attachment A.

The defendant did not just sit at the top of the Website A hierarchy; he also implemented

rules that encouraged lower-ranking users to rise up through the hierarchy themselves by posting

CSAM.  For example, he and his staff identified users who had not been making sufficient progress

toward the next rank, and he instructed lower tiers of management how to softly approach those

users in order to encourage them to keep posting CSAM and earn their next promotion.  If those

users did not do so, the defendant demoted them or threatened to demote them.

The defendant is thus the person who is most responsible for all the horrors of Website A,

which was a sanctuary and playground for enthusiasts of child rape and abuse.  [*See generally* PSR

¶¶ 12-24.]  Its management and members helped facilitate a sprawling and complex criminal

enterprise catering to pedophiles, and its users—of which there were thousands—trafficked in

large volumes of CSAM and discussed the sexual abuse of minors for years.  [*Id.*].  This was by design: the defendant and his accomplices required other users to share CSAM and participate in conversations in order to become members and gain greater access to the site.  And needless to say, the community making up Website A helped its users validate their sexual interest in children "so that actual sexual contact with a child no longer seems as wrong," which reduces the stigma that prevents many offenders from moving from trafficking in CSAM to more serious sexual conduct with children.  *United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014).

In order to cater to the broadest range of pedophiles, Website A had separate "rooms" for different types of CSAM.  For example, website users who enjoy watching the sexual abuse of infants and toddlers had their own dedicated room.  [PSR ¶ 17(c).]  As did users who are sexually thrilled by viewing children being tortured, humiliated, urinated or defecated upon, or screaming in pain.  [*Id.* ¶ 17(d).]  Website A also provided a forum for users to graphically fantasize and role-play the rape and abuse of children.  [*Id.* ¶ 17(e).]

And Website A was not just for individuals who revel in pictures and videos.  It expressly recognized that some of its users were sexually abusing children.  And instead of discouraging that abuse, it gave those users specific, detailed advice on how to continue raping children and creating videos of it without getting caught.  [PSR ¶ 21(e).]

Because the defendant had attained such an exalted rank on Website A, he did not need to post CSAM to the website to maintain his position.  [PSR ¶ 52.]  But he had done so in the past, and the language he used makes unmistakably clear that the defendant delights in the sexual abuse of children.  The following are a selection of his posts to Website A, for example:

- "[preteen][girl][webcam] hot little blonde strips & plays with & shows her delicious pussy & ass"

- "[preteen][boy+girl][fucking] some friendly attempts at fucking in the great outdoors

(contrary to filename I think they're all preteens)"

- "[tween][girl][piss] young [girl's name] has really got to go, so she pisses thru her pajamas on the porch"

- "[various ages][boys][cumming] a great compilation of boys shooting loads of gooey jizz all outside in nature"

- "[tween][boy][masturbate] chubby lad sits on side of road w/ cars driving by and wanks until he cums"

- "[preteen][boys][anal] two asian lads fuck in the river – also lots of anal play & some dick play"

- "[tween][boys][bi] two cute lads in a field take turns sucking each other off"

- "EXTREME CONTENT [screaming][preteen][girl][dp] rare to find all four of these vides, taken of the famous double penetration party of a young latina girl (sadly ended in a bust b/c it was arranged via PM on [another Tor network website dedicated to CSAM]) these four teaser vids were released immediately following the party – the full length video allegedly only exists in LEA custody, because they were busted almost immediately after the party :("

[*See, e.g.,* PSR ¶ 53.]

In November 2022, an FBI tactical team executed a no-knock search warrant at the defendant's home in Madison, Alabama.  This was not an ordinary or routine warrant.  In 2021, the U.S. Department of Justice issued a new policy placing tight restrictions on the use of no-knock warrants.[4]  As a result, the no-knock warrant at the defendant's home needed to be approved at multiple high levels within the Department of Justice.  In part because the defendant was one of the most significant CSAM offenders in the entire world, the no-knock warrant was approved by the Director of the FBI, the Assistant Attorney General of the Criminal Division of the U.S. Department of Justice, and the United States Attorney for the Northern District of Alabama.

---

[4] *See, e.g.,* United States Department of Justice, "Department of Justice Announces Department-Wide Policy on Chokeholds and 'No-Knock' Entries," September 14, 2021, *available at* https://www.justice.gov/opa/pr/department-justice-announces-department-wide-policy-chokeholds-and-no-knock-entries (last visited September 5, 2023).

Agents executed the warrant but the defendant was not about to go down without a fight. The FBI tactical team conducted a dynamic entry into his home with the use of explosive breaching charges. Members of the team carried long guns and were dressed in tactical gear that prominently displayed the letters "FBI." They entered the garage where the defendant presided over Website A, identified themselves as law enforcement, and ordered him to surrender. He did not. Instead, he lunged toward his desk and physically resisted and fought until he was forcibly subdued by multiple agents. [PSR ¶ 62.] Agents struggled to handcuff him because he was resisting, but they eventually succeeded.

The desk in the defendant's garage contained multiple computers he used to store and view child pornography and preside over Website A. It also contained three handguns—not one, but three—within arms' reach of the desk. It is, of course, common and perfectly legal for a person to own a handgun for self-defense. But a person who has *three* handguns at a desk where he manages one of the largest child pornography websites in the world means something else entirely. The FBI fervently believes that the dynamic, no-knock entry prevented bloodshed that day.

And it is no wonder why the defendant physically tried to resist the FBI entry team instead of surrendering. The devices at his desk contained massive quantities of evidence proving that he was the lead administrator of Website A. [PSR ¶¶ 65-68.] Unsurprisingly, the defendant's devices also contained an enormous collection of images and videos depicting the rape and abuse of children, including children as young as newborns. [*Id.* ¶ 69-70.] Despite the defendant's protests that he did not enjoy violent child pornography, he had a collection of it on his devices, including infamous videos depicting the sexual torture and rape of toddlers. [*Id.*] Some of the devices seized from the defendant's home were encrypted and could not be accessed. [*Id.* ¶ 71.]

The defendant's conduct makes clear that he dedicated himself to Website A because he

harbors a deep interest in depictions of children being sexually assaulted.  He told the FBI that he enjoyed watching webcam videos of girls aged 14 to 16 exposing and inserting objects into their vaginas.  In addition to his conduct on Website A, the defendant managed another online pedophile community dedicated to CSAM.  [PSR ¶ 63(g).]

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to his activity on Website A at sentencing— especially because he is the single most culpable offender on the entire website.  *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.").

### B.    The History and Characteristics of the Defendant

The defendant's history and characteristics do not justify a downward variance from the Guidelines range.  The defendant spent nearly half a decade managing a gargantuan child sexual abuse community, which required significant investments of time and labor.  There is no coherent, non-pedophilic explanation for this behavior.  The defendant may suffer from some mental afflictions, but none of them have any causal relationship to his egregious offenses.

 Post-traumatic stress disorder does not make people administer websites dedicated to the rape and exploitation of children.  Depression does not lead people to log onto the internet and describe a prepubescent girl's "pussy & ass" as "delicious."  Other afflictions discussed in  Dr. Amy Swan's report do not cause people to distribute videos of what they gleefully describe as "a great compilation of boys shooting loads of gooey jizz all outside in nature."

Dr. Swan's report struggles to paint a coherent picture of the defendant and his myriad crimes.  It relies almost entirely on the defendant's own unverified reports of his sexual interest and behavior.  It also concludes—contrary to the defendant's own statements—that he does have

some sexual attraction to children as young as 12.

Dr. Swan also makes findings as to the defendant's supposed risk of recidivism, but the actuarial tool she uses to make these predictions—the "Child Pornography Offender Risk Tool" or "C-PORT"—systematically understates the likelihood of recidivism. This is because the C-PORT defines recidivism not as the commission of a new offense, but rather whether a person has any "new arrests, new charges, or new convictions for sexual crimes, based on official records." Angela Wyatt Eke, et al., *Scoring Guide for the Child Pornography Offender Risk Tool (CPORT): Version 2* at 4 (2018). Put differently, the C-PORT does not actually measure the risk of recidivism; it measures the risk that a person will commit another sexual offense *and then get caught and then arrested*. Countless offenders are never detected, and some who are detected are never arrested. The C-PORT cannot measure the defendant's true risk of recidivism.

In addition, there is reason to believe that the defendant is less likely to be caught than the average offender. The defendant is highly intelligent and sophisticated offender with extensive skills. His website contained extensive advice on avoiding law enforcement detection, and he himself was able to avoid detection for years. He is highly trained as a counterintelligence agent. He is vastly more capable than the average offender of committing crimes without detection.

The defendant also relies heavily on his military service as a mitigating factor, but his conduct is directly contrary to the values of the United States armed forces. The military values honor. It is honor that distinguishes U.S. soldiers from armed thugs, and military discharges are characterized by whether the individual served honorably or dishonorably.

But there is nothing honorable about spending years of one's life perpetuating a community of pedophiles that preys on the most vulnerable and defenseless members of society. There is nothing honorable about administering a website dedicated to images and videos of children as

young as infants being raped, abused, and tortured.   There is nothing honorable in distributing a video depicting a "famous double penetration party" of a "screaming" prepubescent girl that "sadly" resulted in the arrest of her rapists.

The defendant's military service has its blemishes as well.  While he spent time serving with distinction and received commendations, he was also formally reprimanded by a Brigadier General under the Uniform Code of Military Justice for "giving a false official statement" and "exercising extremely poor judgment."  Attachment B at 2.  In particular, he disregarded curfew to go to a bar, and when discovered by military police, he failed to provide military ID and lied by telling them he was Canadian. *Id.* at 2, 9, 12-13.  The Brigadier General stated that the defendant's "conduct brings great discredit upon the United States Armed Forces.  As a warrant officer, you are expected to set the highest standards for yourself and for other soldiers to emulate.  Your behavior has materially affected my confidence in your ability to lead soldiers and causes me to seriously question your potential for further service." *Id.* at 2.  Not long after this, his promotion to Chief Warrant Officer 4 was revoked. *Id.* at 17.  He retired from the U.S. Army shortly after.

The bulk of the defendant's service to his country is admirable, but it does not outweigh the enormity of his crimes.  And the fact that he chose to commit them after dedicating a large portion of his life to military service renders his criminal conduct all the more incomprehensible.

In addition, there is reason to suspect that the defendant's interest in underage girls went further than his conduct on Website A.  As the PSR states, the defendant had a falling out with an underage member of Website A after he sent her redacted pictures of himself and his home.  [PSR ¶ 59.]  He admitted that this was a 16-year-old girl, and the FBI believes that she is an identified minor who resides in Eastern Europe.  Along with the "doxx photos," the FBI also received audio files of what this girl represented to be voice messages that the defendant left her.  [*Id.* ¶¶ 59-61.]

In one of these files, a voice identical to the defendant's says the following:

> Hi again, [girl's name].  I wanted to let you know that I think you're beautiful, sexy, sensual, and I want to touch you.  I want to kiss you, hug you, and make sweet love to you.  After that, I want to f—"

The audio cuts out after the word beginning with "f."  In another file, the defendant calls the girl "my sweet" and says "I can't believe you didn't like my first voice.  You're very picky about things like this, I think."  He identifies himself as "Eddie" and says "I hope to see you soon."

The defendant also told the FBI that he turned in this girl's stepfather, who had been sexually abusing her.  The FBI has been able to find no indication that this is true.  Because some of the defendant's devices were encrypted and inaccessible, the FBI cannot say with certainty whether they contain evidence of the defendant's real-time exploitation this girl or other children.

Finally, the defendant has shown himself to be dedicated to criminal activity despite knowing that his coconspirators were being arrested.  As noted above, the defendant detected that Rosenstein, his second-in-command and technical expert, had likely been arrested and his account had been taken over by law enforcement.  Knowing this, he continued running Website A for another four months.  He accessed the ███████████ room the day before his own arrest.

This defendant knew that what he was doing was illegal.  He could have simply stopped at any time.  But he did it anyway.  And he did not stop until he was arrested.  The defendant voluntarily chose his path, and neither his military service nor his mental health undermines this.

**C.**   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

It is beyond dispute that crimes involving the trafficking of CSAM are serious and warrant significant sanctions.  As "[l]ong-term studies" have confirmed, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate."  *United States v. Irey*, 612

F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority).  The fact that the defendant's conduct of conviction does not involve him committing hands-on acts of child sexual abuse does not lessen the significance of his predatory and criminal behavior.

The defendant does not appear to have acknowledged that his conduct harmed real children.  Trafficking in child pornography inherently involves the sexual abuse of children, even if no new child pornography is produced.  *See New York v. Ferber*, 458 U.S. 747, 759 (1982).  In fact, as explained above, the defendant's community-building activity on Website A here very likely played a role in encouraging other users to escalate from possession to production of CSAM. Accordingly, far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014).

Trafficking in CSAM also results in perpetual harm to children who have already been sexually abused, all of whom are grappling with the indelible trauma caused by that abuse.  *See id.* at 440.  As another court noted, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography.  Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759).  Accordingly, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse."  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *see also United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular

16

violating their individual interest in avoiding the disclosure of personal matters").  These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm" when offenders consume, receive, and advertise this CSAM.  *Sherman*, 268 F.3d at 547-48.

It is particularly important that this Court craft a sentence that provides just punishment. 18 U.S.C. § 3553(a)(2)(A).  As the Eleventh Circuit has observed, "because punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be.  The seriousness of a crime varies directly with the harm it causes or threatens.  It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime."  *Irey*, 612 F.3d at 1206.

The defendant did not just violate federal law, he also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their rape and abuse.  Through his own conduct and the conduct that he facilitated through his moderation and support of Website A, the defendant exploited thousands upon thousands of children and helped to revictimize them through the continued trafficking in material depicting their abuse.  This Court should craft a sentence that appropriately expresses social condemnation of the defendant's crimes, captures the serious harm he has caused, and promotes respect for the rule of law.  The government's recommended sentence does all three.

### D. <u>The Need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public</u>

Both specific and general deterrence call for a significant sentence consistent with the Guidelines recommendation here.  With respect to specific deterrence, the risk the defendant poses to children is immense.  While he seeks to blame his conduct on depression, PSTD, and opioids, this is no explanation for why he plunged himself in the dark world of child sexual abuse websites.

To the contrary, common sense indicates that he was viewing this material because he wanted to do what was depicted in the videos he watched and posted online.  Pornography is by its nature fantasy.  And as the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003).  The defendant fits squarely within that class.

More generally, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'"  *Irey*, 612 F.3d at 1211 (citation omitted).  "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'"  *Id.* (citation omitted). As the Eleventh Circuit explained in a similar case, "[y]oung children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others." *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)).  And given that "sentences influence behavior," the Eleventh Circuit has concluded that "the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." *Id.*

General deterrence is especially important in cases like this, in which offenders use sophisticated technology to evade detection.  Website A operated over a network that was designed to keep its users anonymous and generally undetectable by authorities.  [PSR ¶ 12].  It offered advice on how to further keep "safe" from the prying eyes of law enforcement.  [*Id.* ¶ 21.]  Some of this guidance was expressly directed at protecting offenders who were sexually abusing children and producing videos and images of the abuse.  [*Id.* ¶ 21(e).]  Offenders like the defendant engage freely in criminal conduct while knowing it is wrong, but they do it anyway because they can hide

behind the protection of technology.  Countless offenders have escaped detection this way.

The defendant managed to evade capture for years because of his technological sophistication.  The leaders of the next child sexual abuse websites may evade capture altogether unless they are deterred from engaging in this horrific conduct.  A life sentence for the defendant here is best-suited to do so.

E.      **The Need to Avoid Unwarranted Sentencing Disparities and the Kinds of Sentences Available**

1.  The United States' recommendation is consistent with sentences already handed down to the defendant's coconspirators

This Court has already sentenced several of the defendant's coconspirators on Website A. The defendant Selwyn Rosenstein was the second-highest ranking staff member on Website A and was subordinate only to the defendant.  The government recommended a 30-year sentence for Rosenstein, and the Court sentenced him to 28 years in prison, or 336 months.  *See United States v. Rosenstein*, 9:22-cr-80107 (S.D. Fla.), ECF No. 55.  Three other, lower-ranking members of Website A's staff have also been sentenced to between 250 months and 310 months.  [ECF Nos. 186 (280-month sentence for Robert Boyles), 215 (310-month sentence for Gregory Good), 216 (250-month sentence for Matthew Garrell).]

The government's recommended sentence of life imprisonment is fully consistent with these other sentences.  The defendant is more culpable than any other defendant who has been sentenced so far.  He is more culpable than Rosenstein, who received a sentence of 28 years.  That sentence is also a likely effective life sentence for Rosenstein, who was 69 at the time of his arrest. Good and Boyles also received what will likely amount to life sentences, given their age.  Good, who was 75 at the time of his arrest, received a sentence of nearly 26 years.  Boyles, who was 70 at the time of his arrest, received a sentence of more than 23 years.  All of these coconspirators are less culpable than the defendant, and none of them are likely to emerge from prison.

2.   <u>Comparable cases support the United States' recommendation</u>

A review of the sentences imposed in similar cases confirms that a within-Guidelines sentence is warranted here.  In *United States v. Falte, et al.*, No. 3:17-cr-44 (M.D. Tenn.), for example, multiple defendants were—like the defendant here—involved with websites operating over the Tor network that were dedicated to the advertisement and distribution of CSAM and the discussion of child sexual abuse.  *Id.*, ECF No. 232 at 1-2.  Defendants Falte and Faulkner were organizers and leaders of such websites, and the court sentenced each to 35 years in prison.  *Id.*, ECF Nos. 232 at 2-3, 10-13; 237 at 3; 239 at 3.[5]

Administrators and moderators of other CSAM websites have received similar sentences. Defendant Lane in the case of *United States v. John Doe #1, et al.*, No. 5:10-cr-319, (W.D. La.), for example, was one of several co-administrators of a CSAM website who advertised and distributed CSAM over the site, and the court sentenced him to 30 years in prison.  *Id.*, ECF Nos. 965-2 at 1-5, 972 at 2.  Defendant Childs was a "VIP" of the same website—a rank lower than co-administrator—and likewise received 30 years in prison.  *Id.*, ECF Nos. 320-2 at 1-5; 439 at 2.

It bears mention that the Sentencing Table in the United States Sentencing Guidelines refers to numeric sentences, but only up to 30 years.  Every sentence above that is referred to as a life sentence.  *See* U.S.S.G. Chapter 5, Part A.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to life imprisonment, followed by a lifetime of supervised release.

---

[5]  These two defendants also engaged in the hands-on sexual abuse of a minor victim, although this was the subject of separate prosecutions and separate, significant sentences in another district.  *See United States v. Falte*, No. 3:17-cr-49 (E.D. Va.); *United States v. Faulkner*, No. 3:17-cr-45 (E.D. Va.).

Respectfully submitted,

STEVEN J. GROCKI
CHIEF

By:  *s/ KYLE P. REYNOLDS*
   Kyle P. Reynolds
   Trial Attorney (Court ID # A5502872)

   William G. Clayman
   Trial Attorney (Court ID # A5502958)
   U.S. Dept. of Justice, Criminal Division
   Child Exploitation and Obscenity Section
   1301 New York Avenue, NW
   Washington, DC 20005
   Phone: (202) 616-2842
   Email: william.clayman@usdoj.gov
   Email: kyle.reynolds@usdoj.gov

   Gregory Schiller
   Assistant United States Attorney
   Fla. Bar. 048477
   500 S. Australian Ave., Suite 400
   West Palm Beach, FL 33401
   Phone: 561-209-1045
   Email: gregory.schiller@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on September 5, 2023, I electronically filed the foregoing redacted document and redacted Attachment B with the Clerk of Court using CM/ECF.  I also moved to seal the unredacted copy of the foregoing document and Attachment A and conventionally filed these documents with the Clerk of Court.  All documents were emailed to counsel for Mr. Spearman on this day.

*s/ Kyle P. Reynolds*
Kyle P. Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division
